UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

MALEHKI LOHARSINGH,

        Plaintiff,

    v.

CITY AND COUNTY OF SAN
FRANCISCO, ET AL.,

        Defendants.

_____/

Case No. C-08-04725 JCS

**ORDER GRANTING IN PART AND
DENYING IN PART DEFENDANTS'
MOTION FOR SUMMARY JUDGMENT
[Docket No. 52]**

## I.  INTRODUCTION

This civil rights action involves allegations that officers of the San Francisco Police Department ("SFPD") violated Plaintiff's constitutional right to be free from unreasonable seizure and excessive force.  Defendants bring a motion for partial summary judgment ("the Motion").  All parties have consented to the jurisdiction of a United States magistrate judge, pursuant to 28 U.S.C. § 636(c).  On Friday, February 26, a hearing on the Motion was held.  For the reasons stated below, Defendants' Motion is GRANTED in part and DENIED in part.

## II.  BACKGROUND

### A.  Facts

#### 1.  Events Leading up to Encounter Between Plaintiff and SFPD Officers

##### a.  Malehki and Jemahl Loharsingh's Accounts

According to Plaintiff Malehki Loharsingh, on September 22, 2007, he and Erica Spinks, his girlfriend and business partner, as well as Jemahl Loharsingh, his nephew, were passing out flyers in Oakland and Berkeley to promote the release of an upcoming album produced by Plaintiff's production and entertainment company.  Plaintiff's Opposition to Defendants' Motion for Partial Summary Judgment ("Opp'n"), Ex. A (Deposition of Malehki Loharsingh) at 41.  Plaintiff testified

1   that Jemahl's girlfriend, Monique, told the group about a party in San Francisco and Plaintiff,

2   Jemahl, and Spinks decided to go to the party to pass out flyers. *Id.*

3        According to Plaintiff, Spinks drove Plaintiff and Jemahl to San Francisco in her Cadillac.

4   *Id.* at 43. When they were unable to locate the party, they parked at the intersection of 18th Street

5   and Shotwell Street in San Francisco's Mission District. *Id.* at 43, 46, 50. Plaintiff testified that the

6   three continued searching for the party on foot and still could not find it so Monique met the group

7   to help them look. *Id.* at 58. Plaintiff and Jemahl decided to wait in the car while Spinks and

8   Monique continued to search for the party on foot. *Id.* at 58, 70. According to Plaintiff, he retrieved

9   the keys from Spinks, sat in the driver's seat of the Cadillac, and lowered the seat back, while

10  Jemahl sat in the front passenger seat. *Id.* at 70-72. Plaintiff asserts that he placed the keys in the

11  center console and turned on an iPod music player located in the car to listen to music, then placed

12  the iPod between the center console and the driver's seat cushion. *Id.* at 73, 77; Opp'n, Ex. B

13  (Deposition of Jemahl Loharsingh) at 39. Jemahl had a bag of marijuana in his possession during

14  this time, but Jemahl testified that Plaintiff did not know of the marijuana or that Jemahl used

15  marijuana. Opp'n, Ex. B at 67.

16        **b.    Defendant SFPD Officers' Accounts**

17        On September 22, 2007, Officer Cristina Franco and Officer Wesley Villaruel were working

18  on prostitution detail on foot in the Mission District of San Francisco. Defendants' Reply Brief in

19  Support of Motion for Partial Summary Judgment ("Reply"), Ex. L (Deposition of Cristina Franco)

20  at 54. Officers Ernest Trapsi and Timothy Neves were also working in the Mission District in a

21  marked police car. Declaration of Officer Ernest Trapsi in Support of Defendants' Motion for

22  Partial Summary Judgment ("Trapsi Decl.")) ¶ 2. The officers were working in the area around 18th

23  Street and Shotwell Street and claim that they knew it as an area with a high concentration of

24  prostitution, assaults, batteries, thefts, robberies, narcotics use, and other crimes. Declaration of

25  Sergeant Cristina Franco in Support of Defendants' Motion for Partial Summary Judgment ("Franco

26  Decl.") ¶ 2. According to Officer Franco, while investigating a suspected pimp and prostitute, she

27  witnessed the suspects get into a white Honda Civic and begin driving away. Reply, Ex. L at 74.

28  Officer Villaruel reportedly contacted Officer Trapsi and requested that he conduct a traffic stop of

2

the Honda. *Id.* Officer Trapsi and Officer Neves pulled over the Honda at 18th Street and Shotwell Street and Officer Franco and Officer Villaruel arrived shortly thereafter on foot. *Id.* at 75. Officer Franco states that she was the only female officer present at the stop. Franco Decl. ¶ 10.

According to Officer Trapsi, as he prepared to approach the Honda he noticed Plaintiff and Jemahl sitting in the parked Cadillac with their seats reclined. Opp'n, Ex. E (Deposition of Officer Ernest Trapsi) at 23; Trapsi Decl. ¶ 3. Officer Trapsi states he saw Plaintiff make a quick movement as though he was trying to hide from the officers. Opp'n, Ex. E at 23. He described the movement as a quick slouching down and lying back that caused Plaintiff's body, head, and shoulders to lower. *Id.* at 20. Aside from leaning back, the only other movement Officer Trapsi asserts that he saw at that time was Plaintiff popping his head up, looking at Officer Trapsi, and then moving back down. *Id.* at 25-26. According to Officer Trapsi, Plaintiff made eye contact with him and then quickly looked away and ducked his head down. Trapsi Decl. ¶ 3. Officer Trapsi testified that he could not see Malehki or Jemahl Loharsingh's hands and did not hear any sound coming from the Cadillac. Opp'n, Ex. E at 30. At that point, Officer Trapsi had no knowledge of whether Plaintiff was properly licensed to drive. *Id.* at 35.

Officer Franco testified that when she arrived on the scene, Officer Trapsi told her that there was a Cadillac parked next to the patrol car that appeared suspicious. Reply, Ex. L at 86. According to Officer Franco, Officer Trapsi told her that he had observed the occupants of the Cadillac ducking down and that he did not want to turn his back to the Cadillac to approach the Honda out of concern for the safety of the officers. *Id.* at 94; Opp'n, Ex. D (Deposition of Officer Cristina Franco) at 90. Officer Franco asserts that she, Officer Trapsi, and Officer Villaruel then decided to make contact with the occupants of the Cadillac while Officer Neves kept an eye on the Honda. Reply, Ex. L at 96. Officer Franco testified that she did not know at that time whether Plaintiff and Jemahl were committing a crime but that she thought the way they were slouching down was suspicious. *Id.* at 97.

## 2. Encounter Between Plaintiff and SFPD Officers

### a. Malehki Loharsingh's Account

According to Plaintiff, he and Jemahl were sitting in the Cadillac "free-styling" to the music when Plaintiff saw a patrol car drive by. Opp'n, Ex. A at 77. Plaintiff asserts that he turned off the iPod as he watched the patrol car make a U-turn and pull over another vehicle next to the Cadillac. *Id.* at 78-79. As Plaintiff looked to the left out of the driver's side window to watch the traffic stop, he claims that he suddenly saw more than one police officer approaching the Cadillac and ordering him to "Get the fuck out of the car." *Id.* at 86-87. Plaintiff testified that when the police approached the Cadillac he did not try to avoid eye contact. *Id.* at 119. When asked whether he slouched or did anything to evade detection Plaintiff answered, "No, but . . . I think my seat might have been lowered down or whatever to where it could have appeared that way or whatever. I don't know." Reply, Ex. J (Deposition of Malehki Loharsingh) at 118.

Plaintiff does not remember how many officers approached him as he sat in the car. Opp'n, Ex. A at 87. According to Plaintiff, the officers drew their guns as they ordered Plaintiff to put his hands up and get out of the car. *Id.* at 89-90. Plaintiff asserts that from the time when the officers made the traffic stop to the time when they arrived at Plaintiff's door, his right hand was on the steering column under the steering wheel and his left hand was at his side. *Id.* at 96-97, 99; Reply, Ex. J at 98. The officers' approach "happened quick" and Plaintiff estimated that it took only a "couple of minutes" from the time he saw the patrol car make the U-turn to when the police arrived at the driver's door of the Cadillac. Opp'n, Ex. A at 86.

According to Plaintiff, when the officers ordered Plaintiff to put his hands up and get out of the car, Plaintiff put his hands up and asked, "What did we do? Why do we got to step out of the car?" *Id.* at 91. Plaintiff testified that he initially asked the officers why he was being ordered out of the car because he did not understand why he was being asked to get out of the car and wanted to clarify that he had not done anything wrong. *Id.* at 112. As the officers again ordered Plaintiff to "Get the fuck out of the car," Plaintiff claims that he reached toward the door handle to open the door and exit the vehicle. *Id.* at 91. Before he opened the door an officer pulled the door open. *Id.* Plaintiff testified that more than one officer grabbed him by his upper body and pulled him out of the

4

car. *Id.* at 101.  According to Plaintiff, as he was being pulled out of the car he saw and felt a fist hit him in the side of his head but could not see which officer hit him.  *Id.* at 102.  Plaintiff claims he hit the ground face first and felt multiple kicks to the back of his head before he blacked out.  *Id.* at 105. He testified that he did not see which officers kicked him and could not identify them.  *Id.* at 105; Reply, Ex. J at 168.

### b.  Jemahl Loharsingh's Account

According to Jemahl, he and Plaintiff were sitting in the car listening to the iPod and Jemahl was rapping when Jemahl saw the police car.  Opp'n, Ex. B at 39.  Jemahl asserts that he saw the police officers do a U-turn and make a traffic stop of another other car.  *Id.* at 43.  Jemahl testified that Plaintiff turned off the music when the officers were outside of the patrol car and approaching the other car.  *Id.*  He testified that the officers had their guns drawn as they were conducting the traffic stop of the other car when "out of nowhere, they just turn[ed] all their focus to [Jemahl and Plaintiff]."  *Id.* at 44.  Jemahl estimated the time between the police stop of the other car and when the officers began approaching the Cadillac was about one to two minutes.  *Id.*  He cannot remember how many police officers there were, but approximates that there were five or more.  *Id.* at 48. According to Jemahl, neither he nor Plaintiff did anything to evade detection or stoop down, nor did they push their seats back.  *Id.* at 49.

Jemahl testified that as the officers approached, a male officer ordered Plaintiff out of the car and Plaintiff and Jemahl put their hands up.  *Id.* at 52-53.  Jemahl states he did not see Plaintiff grab the steering wheel or steering column and he did not see Plaintiff do anything with the keys or the ignition as the officers approached.  *Id.* at 53.  An officer reportedly said, "Get the fuck out of the car," and, "Open the fucking door."  *Id.* at 55.  According to Jemahl, Plaintiff responded, "What is going on?  What did we do?" and then reached with his left arm for the door handle to open the door.  *Id.*  Jemahl testified that as Plaintiff began to open the door, an officer pulled it open and pulled Plaintiff out of the car.  *Id.*  Jemahl saw an officer strike Plaintiff and testified that the officer who hit Plaintiff was the same officer who opened the driver's side door.  *Id.* at 55-56; Motion, Ex. B at 57.  During deposition, Jemahl described the officer who struck Plaintiff as male, stating "he was an officer," and "he hit him, like he knocked him down."  Motion, Ex. B (Declaration of Jemahl

Loharsingh) at 57. Jemahl saw Plaintiff hit his head on the car as he fell to the pavement after being struck. *Id.* At this point, Jemahl could no longer see what was happening to Plaintiff because the police officers were blocking Plaintiff. *Id.* at 58. A police officer on the passenger side of the Cadillac told Jemahl to get out of the car and Jemahl informed the officer that he was a minor. *Id.* at 59. Jemahl testified that after he exited the car he looked over and saw the other officers "stomping" Plaintiff. *Id.* He could not tell which officers were engaged in this conduct or how many but testified that it was more than two. *Id.* at 62. Jemahl asserts that the kicking and stomping happened fast and lasted for less than a minute, during which time each officer stomped Plaintiff several times. *Id.* at 63; Opp'n, Ex. B at 64.

According to Jemahl, a male police officer questioned him as he stood on the sidewalk on the passenger side of the car and a female officer was near him as well. Motion, Ex. B at 60-61. Jemahl had the marijuana hidden in his mouth at this time. *Id.* at 67. He states that he gave the marijuana to the officer talking to him at the same time that the other officers were handcuffing Plaintiff. *Id.* at 69. Plaintiff appeared unconscious while he was being handcuffed and was not responding to Jemahl's calls. *Id.* at 69; Opp'n, Ex. B at 71.

### c. Officer Franco's Account

Officer Franco and Officer Villaruel assert that they approached the driver's side of the Cadillac while Officer Trapsi approached the passenger side. Reply, Ex. L at 97. According to Officer Franco, as she approached Plaintiff was slouched down in the reclined car seat and then sat up and swung both hands underneath the steering wheel. Opp'n, Ex. D at 99. Officer Franco states that she identified herself as police and repeatedly ordered Plaintiff and Jemahl to raise their hands. *Id.* at 100, 102. She asserts that Plaintiff did not comply with her orders to raise his hands and continued to move his hands in his lap or between his legs inside the vehicle. *Id.* at 102-03. Officer Franco described Plaintiff's movement as "[b]ody movement forward as if he was reaching for something." *Id.* at 103. Concerned that Plaintiff might be reaching for a weapon, she states that she opened the driver's side door of the Cadillac and attempted to control Plaintiff's movements. *Id.* at 107-08. Officer Franco did not see Plaintiff reach for the door handle. *Id.* at 106. Officer Franco testified that she was the first officer to make physical contact with Plaintiff, grabbing his left arm

6

with both hands. *Id.* at 107-08. According to Officer Franco, Plaintiff resisted her attempts to control his arms and pulled away, so Officer Villaruel reached into the car to assist her in getting Plaintiff out of the car. *Id.* at 110. As the officers tried to remove him from the vehicle, Plaintiff allegedly tried to lunge over to the passenger seat, which Officer Franco testified was empty at that time. *Id.* at 108, 110. Officer Franco testified that Jemahl stepped out of the car right at the time when she opened Plaintiff's door and reached in to pull him out. *Id.* at 109. Officer Franco asserts that at no time did any officer strike or kick Plaintiff. *Id.* at 113. After Plaintiff was handcuffed, the officers reportedly sat him upright, at which point Officer Franco went to the passenger side of the car to assist Officer Trapsi with Jemahl. *Id.* at 120-21. Officer Franco testified that she later learned that Plaintiff's eyes were closed and he was not responding to questions and an ambulance was called. *Id.* at 122.

### d. Officer Trapsi's Account

According to Officer Trapsi, as he approached the passenger side of the Cadillac he heard the other officers instructing Plaintiff to raise his hands. Opp'n, Ex. E at 39, 41. Officer Trapsi asserts that he instructed Jemahl to exit the vehicle and escorted him to the sidewalk to talk to him. *Id.* at 45, 47. He does not remember if the driver was still in the Cadillac when Jemahl got out of the vehicle. *Id.* at 48. As Officer Trapsi spoke to Jemahl he noticed that there was an object in his mouth and asked him to remove it. *Id.* at 48-49. Jemahl removed two bags of marijuana from his mouth and handed them to Officer Trapsi. *Id.* at 49. Officer Trapsi asserts that at no time did he punch, kick, stomp on, or strike Plaintiff or anyone else. Trapsi Decl. ¶ 6.

### e. Officer Neves and Officer Villaruel

Officer Neves and Officer Villaruel did not submit declarations, nor was deposition testimony from the officers offered by either party.

### 3. Events After Alleged Excessive Force

According to Plaintiff, when he came to after blacking out he was in handcuffs, seated on the pavement, and leaning against the side of the Cadillac. Opp'n, Ex. A at 115-16. Plaintiff asserts that the officers told him that he had a seizure. *Id.* at 116. Plaintiff claims he has no history of

1   seizures or loss of consciousness. *Id.* at 119. The officers had called an ambulance to treat Plaintiff

2   which arrived shortly after Plaintiff regained consciousness. *Id.* at 116.

3       The medic who treated Plaintiff, Nicholas Brady, does not remember anything about the

4   incident. Motion, Ex. D (Deposition of Nicholas Brady) at 19. His testimony is based entirely on

5   what was written in his medical report. *Id.* The report states that the ambulance was called to the

6   scene for a "syncopal episode" but does not contain any notes about a possible seizure. *Id.* at 18;

7   Opp'n, Ex. C (Deposition of Nicholas Brady) at 52. The report states that the police reported

8   Plaintiff was fighting with them, lost consciousness, and was sitting on the ground complaining of

9   dizziness and aware that he had passed out when Brady arrived. Motion, Ex. D at 27. During a

10  medical assessment, Brady normally asks a patient whether anything is bothering him or he is

11  hurting anywhere. *Id.* at 28. No chest pain, shortness of breath, abdominal pain, nausea or

12  vomiting, headache, or head, neck, back, or pelvic pain were noted in Brady's report on Plaintiff. *Id.*

13  Brady testified that he performed a physical exam and found no indication of pain or injury

14  anywhere he examined. *Id.* at 35. He also wrote "marijuana" in the report, indicating that someone

15  told him that Plaintiff had smoked marijuana, that he had smelled marijuana, or that there were other

16  symptoms of marijuana intoxication. *Id.* at 19-20.

17      Sometime after Plaintiff was handcuffed the officers discovered that he was on parole and

18  that his license was suspended. Motion at 13, & Ex. A at 117; Opp'n, Ex. D at 127. Officer

19  Villaruel contacted Plaintiff's parole agent who placed a parole hold on Plaintiff pursuant to

20  California Penal Code section 3056. Franco Decl. ¶ 12. No weapons were found inside the

21  Cadillac, and no other contraband was found besides the marijuana in Jemahl's mouth. Opp'n, Ex.

22  D at 103.

23      According to Plaintiff, when he was at the police station he said to two or three officers,

24  "God doesn't like ugly, and I didn't do nothing wrong, you know, so God is going to make you

25  pay." Opp'n, Ex. A at 165. Plaintiff denies saying, "I'm going to make you pay for it," "You're

26  going to pay for it," or "You're going to find out who I am." *Id.* at 166. Officer Franco disputes

27  this, alleging that Plaintiff became irate at the police station and stated, "You are all going to pay for

28  this," "I'm somebody you guys will find out soon enough," "It's going to come around. I'm not just

nobody. You guys wait and see," and "I'm going to get all the arresting officers' names." Franco Decl. ¶ 13. Officer Franco understood these statements to be threats of violence against her and other officers. *Id.*

**B.    The Complaint**

Plaintiff filed this action on October 14, 2008. He names as Defendants SFPD Officers Ernest Trapsi and Cristina Franco ("the SFPD Individual Defendants").[1] In addition, he names as Defendants Heather Fong, in her official capacity as Chief of the San Francisco Police Department, and the City and County of San Francisco.

Plaintiff asserts the following claims in his complaint.

| | |
|---|---|
| Claim One: | **Unreasonable Seizure and Excessive Force– Federal Law** (42 U.S.C. § 1983); asserted against all Defendants. Complaint, ¶¶ 23-24. |
| Claim Two: | **Denial of Due Process, Equal Protection and Right to Be Free from Pre-conviction Punishment– Federal Law** (42 U.S.C. § 1983); asserted against all Defendants. Complaint, ¶¶ 25-29. |
| Claim Three: | **Denial of Right to Familial Relationship – Federal Law** (42 U.S.C. § 1983); asserted against all Defendants. Complaint, ¶¶ 30-32. |
| Claim Four: | **Denial of Due Process – State Law** (California Constitution, Art. I, § 7(a)); asserted against all Defendants. Complaint, ¶¶ 33-34. |
| Claim Five: | **Denial of Equal Protection – State Law** (California Constitution, Art. I, § 7(a)); asserted against all Defendants. Complaint, ¶¶ 35-36. |
| Claim Six: | **Violation of California Civil Rights – State Law** (California's Bane Act, Cal. Civ. Code §§ 52.1); asserted against all Defendants. Complaint, ¶¶ 37-38. |
| Claim Seven: | **Assault – State Law** (California common law); asserted against all Defendants. Complaint, ¶¶ 39-42. |
| Claim Eight: | **Battery – State Law** (California common law); asserted against all Defendants. Complaint, ¶¶ 43-46. |
| Claim Nine: | **False Imprisonment – State Law;** asserted against all Defendants. Complaint, ¶¶ 47-50. |
| Claim Ten: | **Negligence – State Law** (California common law); asserted against all Defendants, including the City and County of San Francisco. Complaint, ¶¶ 51-53. |

---

[1]The Complaint also names Officer Timothy Neves and Does 1-100 as Defendants but does not name Officer Wesley Villaruel. At the February 26 hearing, Plaintiff stipulated to the dismissal of Officer Neves as a Defendant.

| | |
|---|---|
| Claim Eleven: | **Negligent Infliction of Emotional Distress – State Law** (California common law); asserted against all Defendants.  Complaint, ¶¶ 54-56. |
| Claim Twelve: | **Intentional Infliction of Emotional Distress – State Law** (California common law); asserted against all Defendants.  Complaint, ¶¶ 57-59. |
| Claim Thirteen: | **Negligent Hiring, Training, Supervision and Discipline – State Law** (California Common Law); asserted against all Defendants. Complaint, ¶¶ 60-63. |

## C.     The Motion

In the Motion, Defendants seek summary judgment on several grounds.  First, Defendants assert that they are entitled to summary judgment as to Claims One through Three to the extent those claims are based on false arrest and/or false imprisonment.  In particular, Defendants argue that the false arrest/false imprisonment claims[2] fail, as a matter of law, because the undisputed evidence shows that: 1) the SFPD Individual Defendants had a reasonable suspicion to conduct an investigative detention for officer safety purposes; and 2) there was probable cause to arrest Plaintiff.  Defendants argue that there was probable cause based on California Penal Code section 148 (resisting, delaying or obstructing a peace officer), California Penal Code section 272(a)(1) (contributing to the delinquency of a minor), California Vehicle Code section 14601.1(a) (driving on a suspended license) and California Penal Code sections 69 and 422 (threats to a police officer).

---

[2] Both Defendants and Plaintiff refer to Plaintiff's "false arrest and false imprisonment claims" without distinguishing between the two types of claims.  The Supreme Court has explained the relationship between these two claims as follows:

> False arrest and false imprisonment overlap; the former is a species of the latter. "Every confinement of the person is an imprisonment, whether it be in a common prison or in a private house, or in the stocks, or even by forcibly detaining one in the public streets; and when a man is lawfully in a house, it is imprisonment to prevent him from leaving the room in which he is." M. Newell, Law of Malicious Prosecution, False Imprisonment, and Abuse of Legal Process § 2, p. 57 (1892) (footnotes omitted). *See also* 7 S. Speiser, C. Krause, & A. Gans, American Law of Torts § 27:2, ¶. 940-942 (1990). We shall thus refer to the two torts together as false imprisonment. That tort provides the proper analogy to the cause of action asserted against the present respondents for the following reason: The sort of unlawful detention remediable by the tort of false imprisonment is detention without legal process, *see, e.g.*, W. Keeton, D. Dobbs, R. Keeton, & D. Owen, Prosser and Keeton on Law of Torts § 11, p. 54, § 119, ¶. 885-886 (5th ed.1984); 7 Speiser, *supra*, § 27:2, at 943-944, and the allegations before us arise from respondents' detention of petitioner without legal process in January 1994. They did not have a warrant for his arrest.

*Wallace v. Kato*, 549 U.S. 384, 388-389 (2007).  Here, as in *Wallace*, Plaintiff was arrested without a warrant.  Therefore, the Court uses the term "false imprisonment" rather than "false arrest."

Second, Defendants contend that summary judgment should be granted on Plaintiff's excessive force claims to the extent that they are asserted against Officers Franco and Trapsi because the undisputed evidence shows that these officers were not involved in the alleged punching and kicking of Plaintiff. Rather, Defendants assert, these officers were on the other side of the car talking to Jemahl while this was occurring. In further support of this argument, Defendants assert that any use of force *prior* to the alleged punching and kicking, namely, the force used to pull Plaintiff out of the car, was reasonable, as a matter of law.

Third, Defendants argue that Claim Two, based on the alleged denial of Plaintiff's right to due process and equal protection, fails because there is no evidence of discriminatory intent.

Fourth, Defendants assert that Plaintiff's claim for loss of familial relations (Claim Three) fails because there is no evidence that Plaintiff was separated from his children.

Fifth, Defendants assert that the officers are entitled to qualified immunity because the undisputed evidence shows that the officers could have *reasonably believed* that their conduct was lawful.

Sixth, summary judgment should be entered on all federal claims against the City and County of San Francisco because Plaintiff has not offered any evidence of a policy or custom sufficient to give rise to municipal liability under *Monell v. Department of Social Services*, 436 U.S. 658, 690 (1987).

Seventh, Defendants are entitled to summary judgment on all of Plaintiff's state law claims because Plaintiff did not comply with the pre-filing requirements of the California Government Code. In particular, before bringing suit against a public entity based on an alleged tort, a claimant must file with the public entity a claim for personal injury within six months of the accrual of the cause of action. Cal. Gov't Code § 911.2. If the public entity determines that the claim was untimely, it may return the claim without acting upon it. *Id*. § 911.3(a). In that case, the claimant must seek permission to file a late claim. *Id*. § 911.4(a). If that request is denied, the claimant must obtain an order from the Superior Court allowing the claimant to file suit despite the fact that the claim was untimely. *Id*. § 946.6. Here, it is undisputed that: 1) Plaintiff's claim was rejected as untimely; 2) his subsequent late claim application was denied; and 3) Plaintiff did not obtain an

1   order from the Superior Court allowing him to file suit.

2       Eighth, Defendants assert that Claims Four and Five for denial of due process and equal

3   protection under state law fail because California law does not contain a private right of action for

4   the alleged violations.

5       Ninth, Defendants assert that Claim Six fails because the Bane Act, which prohibits a

6   defendant from "interfer[ing] by threats, intimidation, or coercion" with a plaintiff's exercise or

7   enjoyment of his constitutional or statutory rights, cannot be predicated on alleged excessive force

8   alone. Rather, it requires that the defendant intended to interfere with a separate state or federal

9   right. Defendants assert that Plaintiff has not pointed to evidence of intentional interference with

10  any such separate right.

11      Tenth, Defendants assert that Plaintiff's state law claims for assault, battery and false

12  imprisonment fall within the privilege established under California Penal Code sections 835a and

13  836.5(b) and therefore fail to the same extent as do Plaintiff's federal claims.

14      Eleventh, Defendants argue that Plaintiff's negligence claims – Claims Ten, Eleven and

15  Thirteen – fail as a matter of law because there is no evidence of negligence in the record.

16      Twelfth, Defendants assert that Claim Eleven, for negligent infliction of emotional distress,

17  fails for the additional reason that there is no tort of negligent infliction of emotional distress that is

18  independent of negligence.

19      Thirteenth, Defendants seek summary judgment on Plaintiff's claim for intentional infliction

20  of emotional distress on the basis that it is "duplicative, superfluous and unsubstantiated."

21      Fourteenth, Defendants seek summary judgment as to Claim Thirteen, for negligent hiring,

22  because the City and County of San Francisco has already admitted that the officers were acting

23  within the course and scope of their employment and therefore, the City is vicariously liable for the

24  officers' conduct.

25      In his Opposition, Plaintiff concedes that his state law claims are barred. Plaintiff also

26  withdraws Claim Three for loss of familial relations and all *Monell* claims against the City and

27

28

12

County of San Francisco.[3]  Plaintiff argues that the remaining federal claims should survive

summary judgment, making the following specific arguments.  First, as to the claims for false

imprisonment, Plaintiff argues that there are factual disputes relating to the encounter and that as a

result, a reasonable juror could conclude that there was no probable cause to arrest Plaintiff, or even

reasonable suspicion to detain him.

With respect to the specific crimes for which Defendants assert there was probable cause,

Plaintiff argues that Defendants' probable cause arguments are deficient on several grounds.  As to

Defendants' reliance on California Penal Code section 148 (resisting, delaying, or obstructing a

peace officer), Plaintiff argues that when viewed in the light most favorable to Plaintiff, the evidence

shows that Plaintiff complied with the officers' requests and that his question, "Why do we have to

get out of the car?" was rhetorical rather than resistant.  Plaintiff notes that section 148 is usually

applied to acts of physical resistance, citing *In re Mohammed C.*, 95 Cal. App. 4th 1325 (2002)

(holding that section 148 "must be applied with great care to speech").  As to California Penal Code

section 272(a)(1) (contributing to the delinquency of a minor), Plaintiff argues that there is no

evidence that Plaintiff knew his nephew had marijuana.  Plaintiff also rejects Defendants' assertion

that there was probable cause to believe that Plaintiff was driving on a suspended license in violation

of California Vehicle Code section 14601.1(a) because a jury could reasonably conclude that

Plaintiff was not driving.  Further, Plaintiff asserts that there is a fact question as to whether

Plaintiff's statements after he was taken into custody constituted "threats" under California Penal

Code sections 69 and 422.  Finally, Plaintiff rejects Defendants' reliance on the fact that Plaintiff

was a parolee, asserting that this does not give rise to probable cause because the officers were

unaware of this when they made the decision to arrest him.

Second, Plaintiff rejects Defendants' assertion that summary judgment should be granted on

Plaintiff's excessive force claims as to Officers Trapsi and Franco.  Plaintiff argues that there is a

triable issue of fact as to which officers committed which acts and therefore, neither officer is

entitled to summary judgment.  In addition, with respect to Officer Franco, Plaintiff argues that there

---

[3]At the February 26 hearing, Plaintiff stipulated to the dismissal of all state law claims, the claim for loss of familial relations, and the *Monell* claim.

13

is evidence from which a reasonable juror could conclude that she used excessive force *before* any punching or kicking occurred.

Third, Plaintiff argues that summary judgment should not be granted on Plaintiff's equal protection and due process claims because the incident was "rife with racial overtones" and therefore, there is a triable issue of fact as to whether the arrest was racially motivated. Plaintiff points in particular to evidence that: 1) Plaintiff and his nephew are African-American; 2) the Defendant officers were investigating an African-American woman who they believed to be a prostitute; and 3) the officers were investigating whether Plaintiff was the suspect's pimp.

Fourth, Plaintiff argues that the SFPD Individual Defendants are not entitled to qualified immunity because a reasonable juror could conclude from the evidence that Plaintiff was doing nothing suspicious and that there was no probable cause to arrest him. As it is clearly established that probable cause, or at least, reasonable suspicion, was required to detain Plaintiff, the officers are not entitled to qualified immunity.

## III. ANALYSIS

### A. Legal Standard under Rule 56(c)

Rule 56 of the Federal Rules of Civil Procedure provides that summary judgment "shall be rendered forthwith if the pleadings, depositions, answers to interrogatories, and admissions on file, together with affidavits, if any, show that there are no genuine issues as to any material fact and that the moving party is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(c). A "genuine" issue of material fact exists if there is sufficient evidence for a reasonable jury to return a verdict for the non-moving party. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986).

In order to prevail, a party moving for summary judgment must show the absence of a genuine issue of material fact with respect to an essential element of the nonmoving party's claim, or to a defense on which the nonmoving party will bear the burden of persuasion at trial. *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986); *see also Nissan Fire & Marine Ins. Co. v. Fritz Cos. Inc.*, 210 F.3d 1099 (9th Cir. 2000). Once the movant has made this showing, the burden shifts to the party opposing summary judgment to "designate specific facts showing there is a genuine issue for trial." *Celotex*, 477 U.S. at 323. To establish a "genuine" issue of fact when opposing summary judgment,

a plaintiff must "produce at least some significant probative evidence tending to support" the allegations in the complaint. *Smolen v. Deloitte, Haskins & Sells*, 921 F.2d 959, 963 (9th Cir. 1990).

## B.     The False Imprisonment Claim under 42 U.S.C. § 1983

Defendants assert that they are entitled to summary judgment on Plaintiff's federal false imprisonment claim because the undisputed evidence shows that the officers had a reasonable suspicion as to Plaintiff. In addition, Defendants argue that, as a matter of law, they had probable cause to arrest Plaintiff. The Court concludes that Defendants are not entitled to summary judgment on these claims because there are factual disputes with respect to both reasonable suspicion and probable cause.

### 1.     Fourth Amendment Requirements

In cases where officers make an arrest without a search warrant, the Fourth Amendment imposes limitations on both the initial stop and the subsequent arrest. *See Terry v. Ohio*, 392 U.S. 1, 17 n.15 (1968) (concluding that "the Fourth Amendment governs all intrusions by agents of the public upon personal security" but that reasonableness under the Fourth Amendment depends on the "scope of the particular intrusion, in light of all of the exigencies of the case").

In *Terry*, the Supreme Court held that "the police can stop and briefly detain a person for investigative purposes if the officer has a reasonable suspicion supported by articulable facts that criminal activity 'may be afoot,' even if the officer lacks probable cause." *United States v. Sokolow*, 490 U.S. 1, 7 (1989) (citing *Terry*, 392 U.S. at 30)). A person is seized for investigative purposes within the meaning of *Terry* if "'taking into account all of the circumstances surrounding the encounter, the police conduct would have communicated to a reasonable person that he was not at liberty to ignore the police presence and go about his business.'" *United States v. Washington*, 490 F.3d 765, 769 (9th Cir. 2007) (quoting *Florida v. Bostick*, 501 U.S. 429, 437 (1991)). To determine whether reasonable suspicion exists a court "must look at the 'totality of the circumstances' of each case to see whether the detaining officer has a 'particularized and objective basis' for suspecting legal wrongdoing." *United States v. Arvizu*, 534 U.S. 266, 273 (2002) (quoting *United States v. Cortez*, 449 U.S. 411, 417-18 (1981)). A seizure may only be justified by reference to factors that were present up to the time the stop was made. *Montero-Camargo*, 208 F.3d at 1130 n.11.

"An individual's presence in an area of expected criminal activity, standing alone, is not enough to support a reasonable, particularized suspicion that the person is committing a crime." *Illinois v. Wardlow*, 528 U.S. 119, 124 (2000). In cases where the court has relied on an individual's presence in an area of criminal activity, it has been combined with other facts supporting the existence of reasonable suspicion. *See id.* Evasive behavior, furtive movements, and suspicious eye contact are all relevant factors in evaluating whether the totality of the circumstances supports reasonable suspicion. *See id.* ("nervous, evasive behavior is a pertinent factor in determining reasonable suspicion"); *United States v. Montero-Camargo*, 208 F.3d 1122, 1136 (9th Cir. 2000) (eye contact, or the lack thereof, when evaluated in light of the circumstances, "may be considered as a factor establishing reasonable suspicion"); *Kyles v. Erickson*, 99 F.3d 1146, (9th Cir. 1996) (furtive movement of suspect in car is a circumstance contributing to reasonable suspicion).

Once officers have decided to arrest an individual, the Fourth Amendment imposes the more demanding requirement that the officers have probable cause. *See Sokolow*, 490 U.S. at 7 ("the level of suspicion for a *Terry* stop is obviously less demanding than that for probable cause"). The Supreme Court has held that probable cause is "knowledge or reasonably trustworthy information sufficient to lead a person of reasonable caution to believe that an offense has been or is being committed by the person being arrested." *Beck v. Ohio*, 379 U.S. 89, 91 (1964). "While conclusive evidence of guilt is of course not necessary under this standard to establish probable cause, '[m]ere suspicion, common rumor, or even strong reason to suspect are not enough.'" *United States v. Lopez*, 482 F.3d 1067, 1072 (9th Cir. 2007) (quoting *McKenzie v. Lamb*, 738 F.2d 1005, 1008 (9th Cir. 1984)).

The standard for judging probable cause is objective; the existence of probable cause does not depend on the subjective intentions of the arresting officers. *Id.* (citing *Devenpeck v. Alford*, 543 U.S. 146, 153 (2004)). Thus, probable cause supports an arrest so long as the arresting officers had probable cause to arrest the suspect for any criminal offense, regardless of their stated reason for the arrest. *Devenpeck*, 543 U.S. at 153-155. Under the collective knowledge doctrine, in determining whether probable cause exists for arrest, courts look to "the collective knowledge of all the officers involved in the criminal investigation although all of the information known to the law enforcement

1    officers involved in the investigation is not communicated to the officer who actually" makes the

2    arrest. *United States v. Ramirez*, 473 F.3d 1026, 1032 (9th Cir. 2007).

3          To determine whether a police action constitutes a *Terry* stop or an arrest, courts look at the

4    totality of the circumstances:

5          There is no bright line rule to determine when an investigatory stop becomes an arrest. . . .
       In looking at the totality of the circumstances, we consider both the intrusiveness of the stop,
6       i.e., the aggressiveness of the police methods and how much the plaintiff's liberty was
       restricted, and the justification for the use of such tactics, i.e., whether the officer had
7       sufficient basis to fear for his safety to warrant the intrusiveness of the action taken.

8    *Washington v. Lambert*, 98 F.3d 1181, 1185 (9th Cir. 1996).  While certain police actions will

9    constitute an arrest in some circumstances, such as where the suspects are cooperative, those same

10   actions may not constitute an arrest where the suspect is uncooperative or the police have specific

11   reasons to believe that a serious threat to officer safety exists. *Id.*  "The relevant inquiry is always

12   one of reasonableness under the circumstances." *Id.* (quoting *Allen v. City of Los Angeles*, 66 F.3d

13   1052, 1057 (9th Cir. 1995)) (internal quotation marks omitted).  Handcuffing, drawing weapons, and

14   physical restriction of the suspect, as well as the number of police officers present, are all relevant

15   factors in evaluating the intrusiveness of the stop. *Id.* at 1189-90.  When the police have only

16   reasonable suspicion to make an investigatory stop, drawing weapons and using handcuffs and other

17   restraints may violate the Fourth Amendment. *Id.* at 1187 (finding detention was arrest where police

18   ordered plaintiffs from their car at gunpoint; handcuffed, frisked, and placed plaintiffs in patrol cars;

19   plaintiffs were compliant; and officers had merely a generalized concern that plaintiffs might be

20   armed).  However, a stop is not automatically converted into an arrest when officers point their

21   weapons at a suspect, use handcuffs, and detain the suspect for questioning. *Allen*, 66 F.3d at 1056;

22   *see also Gallegos v. City of Los Angeles*, 308 F.3d 987, 992 (9th Cir. 2002) (finding *Terry* stop did

23   not become arrest where officers ordered plaintiff from car at gunpoint; handcuffed, frisked, and

24   placed plaintiff in a patrol car; plaintiff was compliant; and officers were not convinced a

25   particularized danger existed).

26

27

28

### 2.    Reasonable Suspicion

Defendants argue that they are entitled to summary judgment on Plaintiff's false imprisonment claim because the officers had reasonable suspicion to detain Plaintiff out of concern for officer safety and to determine whether Plaintiff was engaged in criminal activity.  To support the officers' reasonable suspicion, Defendants point to the officers' testimony that: 1) they were conducting a traffic stop in a high-crime neighborhood when they encountered Plaintiff; 2) Plaintiff was reclining in his seat and appeared to be attempting to avoid detection; 3) as the police approached his vehicle, Plaintiff was making furtive movements such as slouching in his seat and thrusting his hand between the driver's seat and center console; 4) Plaintiff was nervously glancing to and from the officers; 5) as the officers came closer, Plaintiff "inexplicably" placed his hand behind the steering column; 6) Jemahl was hiding bags of marijuana in his mouth.   The Court concludes that Defendants are not entitled to summary judgment on this basis because there are fact questions as to whether the officers had reasonable suspicion to detain Plaintiff at the point he was seized.

The question of whether Defendants had reasonable suspicion to detain Plaintiff cannot be resolved without determining at what point in Plaintiff's encounter with the police he was seized, for the purposes of *Terry*.   As to that question, much of the evidence relating to the initial encounter between Plaintiff and the Defendant officers is disputed.  Plaintiff claims that immediately after the officers made the traffic stop of the Honda they approached his vehicle with their guns drawn and ordered him to "Get the fuck out of the car."  Opp'n, Ex. A at 86-90.  Drawing all reasonable inferences in favor of Plaintiff, a jury could conclude based on this evidence that the seizure occurred immediately upon the officers' approach toward Plaintiff's car because  a reasonable person in Plaintiff's position would have believed he was not free to leave at that point. *See, e.g., United States v. Reyes*, 225 Fed. Appx. 699, 700 (9th Cir. 2007) (when a police officer "immediately exited his police car, ordered [plaintiff] to put his hands on the steering wheel, and instructed the occupants of the [car parked next to plaintiff's car] to leave," plaintiff was seized for Fourth Amendment purposes, therefore the officer needed to have reasonable suspicion).

Next, assuming the jury concluded that the *Terry* stop began at the point when the officers

approached Plaintiff's car with guns drawn, there also are material disputes of fact with respect to whether the officers had reasonable suspicion to detain Plaintiff at that time. In particular, Plaintiff's account differs significantly from the accounts of the officers. In contrast to the testimony of the officers that Plaintiff slouched down in his seat, avoided eye contact with them, and made movements with his hands that might have suggested he was reaching for a gun, Plaintiff testified that he did not lower his seat upon the officers' approach or do anything to evade detection, did not avoid eye contact and kept his hands on the steering column from the time the officers made the traffic stop of the Honda until the time he raised his hands in response to the approaching officers' commands. *Id*. at 96-99, 118-119. Viewing the evidence in the light most favorable to Plaintiff, a jury could conclude that Plaintiff was not making furtive movements, attempting to evade detection, or avoiding eye contact with the officers up to the time the stop was made. Nor is the evidence that Jemahl had hidden bags of marijuana in his mouth sufficient to give rise to reasonable suspicion at the time of the seizure because there is no evidence that the officers were aware of this fact when they approached Plaintiff's car.

Further, the fact that Plaintiff's car was parked in a high-crime area with his seat reclined does not entitle Defendants to summary judgment because this evidence, though undisputed, would not be sufficient, as a matter of law, to support a reasonable and particularized suspicion of Plaintiff. In those cases where a court has relied on presence in an area of criminal activity, it has been combined with another fact such as attempting to flee. *See Wardlow*, 528 U.S. at 124 ("In this case, moreover, it was not merely respondent's presence in an area of heavy narcotics trafficking that aroused the officers' suspicion, but his unprovoked flight upon noticing the police."). Plaintiff's lowered car seat, however, is not comparable to an attempt to flee and does not amount to evasive behavior that, when combined with the high-crime neighborhood, would justify finding, as a matter of law, that Defendants had reasonable suspicion that Plaintiff posed a safety threat to the officers or may have been engaged in criminal activity.

In sum, viewing the evidence in the light most favorable to Plaintiff, the Court finds that genuine issues of material fact exist regarding whether the officers possessed a reasonable suspicion that Plaintiff posed a safety threat or was engaging in criminal activity. Accordingly, Defendants'

19

1    request for summary judgment as to the question of whether reasonable suspicion existed to seize

2    Plaintiff for purposes of an investigatory stop is DENIED.

3              **3.        Probable Cause**

4         Defendants argue that, as a matter of law, their actions also did not violate Plaintiff's Fourth

5    Amendment rights because the officers had probable cause to arrest Plaintiff for four different

6    violations: 1) delaying and obstructing a peace officer in the performance of his or her duties in

7    violation of California Penal Code section 148; 2) contributing to the delinquency of a minor in

8    violation of California Penal Code section 272(a)(1); 3) driving on a suspended license in violation

9    of California Vehicle Code section 14601.1(a); and 4) threats to a police officer in violation of

10   California Penal Code sections 69 and 422.

11            **a.        California Penal Code § 148 (resisting, delaying, or obstructing a**

12                        **peace officer)**

13        California Penal Code section 148(a)(1) prohibits a person from "willfully resist[ing],

14   delay[ing], or obstruct[ing] any . . . peace officer . . . in the discharge or attempt to discharge any

15   duty of his or her office or employment."  The legal elements of a violation of section 148(a) are

16   "(1) the defendant willfully resisted, delayed, or obstructed a peace officer, (2) when the officer was

17   engaged in the performance of his or her duties, and (3) the defendant knew or reasonably should

18   have known that the other person was a peace officer engaged in the performance of his or her

19   duties."  *In re Muhammed C.*, 95 Cal. App. 4th 1325, 1329 (2002).

20        Although section 148 is most often applied to the physical acts of a defendant, such as

21   physical resistance, hiding, or running away from a police officer, it is not limited to nonverbal

22   conduct.  *Id.* at 1329-30.  Courts have noted, however, that "'it surely cannot be supposed that Penal

23   Code section 148 criminalizes a person's failure to respond with alacrity to police orders.'"  *Id.* at

24   1330 (quoting *People v. Quiroga*, 16 Cal. App. 4th 961, 966 (1st Dist. 1993)).  Although section 148

25   proscribes resisting, delaying, or obstructing a police officer, "'the First Amendment protects a

26   significant amount of verbal criticism and challenge directed at police officers.'"  *Id.* at (quoting

27   *Houston v. Hill*, 482 U.S. 451, 461 (1987)).  "The freedom of individuals verbally to oppose or

28

challenge police action without thereby risking arrest is one of the principal characteristics by which we distinguish a free nation from a police state." *Houston*, 482 U.S. at 462-63.

Here, there are factual disputes relating to whether Plaintiff resisted arrest. Defendants cite to testimony by the officers that Plaintiff did not immediately comply with the officers' instructions to exit his vehicle and instead argued with them by asking what was going on and why he was being ordered to get out of the car. According to Defendants, Plaintiff then physically resisted the officers' attempts to remove him from the car. Defendants contend that given the high-crime neighborhood, Plaintiff's furtive movements, and the fact that the officers were attempting to conduct a traffic stop of the Honda, Plaintiff's nonresponsiveness to the officers' instructions delayed and obstructed their attempts to investigate the Honda and to ensure officer safety by confirming that Plaintiff was not armed. In contrast, Plaintiff contends that he immediately complied with the officers' orders to raise his hands, even though he asked "what did we do" and "why do we got to step out of the car,"and then reached toward the door handle to open the door and exit the vehicle, as instructed. Viewing the evidence in the light most favorable to Plaintiff, a jury could reasonably conclude that Plaintiff did not resist arrest in violation of section 148. *See Quiroga*, 16 Cal. App. 4th at 964, 966 (finding "nothing in [defendant's] conduct that might justify a charge of violating Penal Code section 148" where defendant was uncooperative, argued before complying with an officer's orders, and was slow to comply). Accordingly, Defendants are not entitled to summary judgment on the basis that probable cause existed under section 148.

### b. California Penal Code § 272(a)(1) (contributing to the delinquency of a minor)

Under California Penal Code § 272(a)(2), any person who "commits any act or omits the performance of any duty, which act or omission causes or tends to cause or encourage" the delinquency of any person under the age of 18 years is guilty of a misdemeanor. Defendants note that Jemahl was seventeen years old, on juvenile probation, and concealing two bags of marijuana in his mouth while he was sitting in the parked Cadillac with Plaintiff. On this basis, Defendants argue that the officers had probable cause to arrest Plaintiff for contributing to the delinquency of a minor in violation of section 272(a)(1). This argument fails because, viewing the evidence in the light

most favorable to plaintiff, a jury could reasonably conclude that the *Terry* stop turned into an arrest before the officers learned that Jemahl was a minor or that he had the marijuana in his possession. In that case, there could not have been probable cause under section 272(a)(1) at the time of the arrest.

Further, the mere fact that Jemahl possessed marijuana – even if it were known to the officers at the time of Plaintiff's arrest – is insufficient, under California law, to give rise to probable cause for contributing to the delinquency of a minor. *See People v. Superior Court*, 14 Cal. App. 3d 935, 949-50 (1st Dist. 1971) (minor passenger's possession of drug paraphernalia and an open can of beer insufficient to support arrest for contributing to the delinquency of a minor); *People v. Simon*, 45 Cal. 2d 645, 649 (1955) (the mere fact that defendant was walking down the street with a 20 year old friend who had a bottle of liquor did not constitute reasonable suspicion to believe that defendant was contributing to the delinquency of a minor). Therefore, the Court denies Defendants' request for summary judgment on this basis.

### c.     California Vehicle Code § 14601.1 (driving on a suspended license)

California Vehicle Code section 14601.1(a) states that "[n]o person shall drive a motor vehicle when his or her driving privilege is suspended or revoked for any reason . . . if the person so driving has knowledge of the suspension or revocation." In order for Defendants to have had probable cause under this statute, then, Defendant officers would have needed probable cause to believe *both* that Plaintiff had been driving the car *and* that Plaintiff knew that his driver's license had been suspended when he was driving.

As to the first question, the undisputed evidence provides sufficient grounds upon which to find, as a matter of law, that the officers had probable cause to believe that Plaintiff had been driving the car. The California Vehicle Code defines "driver" broadly to include "a person who drives *or is in actual physical control of* a vehicle." Cal. Vehicle Code § 305 (emphasis added). California courts have held that this broad standard is met where an individual is seated in the driver's seat of a parked car. *See Adler v. Dep't of Motor Vehicles*, 228 Cal. App. 3d 252, 258 (2d Dist. 1991) (holding that plaintiff was the "driver" of a vehicle under section 305 on the basis of evidence that

she was seated in the driver's seat of a parked car when she opened the door of the car and hit a bicyclist, even though she was not seen actually driving the car).  The undisputed fact that Plaintiff was sitting in the driver's seat of the car is enough to establish probable cause to believe he was driving.

The evidence is disputed, however, on the question of whether the Officers knew that Plaintiff was driving on a suspended license at the time of the arrest.  In particular, as discussed above, there are factual disputes relating to the point at which the investigative detention of Plaintiff turned into an arrest.  Because the Court cannot resolve that question as a matter of law, it also cannot find on summary judgment that probable cause existed under California Vehicle Code section 14601.1.  Therefore, Defendants are not entitled to summary judgment on this basis.[4]

### d.        California Penal Code §§ 69 and 422 (threats to a police officer)

California Penal Code section 69 prohibits the "attempt[], by means of any threat or violence, to deter or prevent an executive officer from performing any duty imposed upon such officer by law," and section 422 prohibits willful threats "to commit a crime which will result in death or great bodily injury to another person, with the specific intent that the statement . . . is to be taken as a threat."  Defendants contend that Plaintiff threatened Officer Franco and the other police officers while in police custody, thereby creating probable cause to arrest Plaintiff for making criminal threats in violation of section 69 and section 422.

It is uncontested that Plaintiff's alleged threats did not occur until he was in custody at the police station and therefore already under arrest.  *See United States v. Parr*, 843 F.2d 1228, 1231 (9th Cir. 1988) ("a distinction between investigatory stops and arrests may be drawn at the point of transporting the defendant to the police station").  Because Plaintiff did not make the allegedly threatening statements until after he was already under arrest, Defendants did not have probable cause based on these statements at the time Plaintiff was arrested.  Further, the evidence regarding

---

[4]At oral argument, Plaintiff conceded, however, that if at some later time there were probable cause for arrest, then damages based on the alleged false arrest would be cut off at that point.

1  Plaintiff's statements is disputed.  Accordingly, Defendants are not entitled to summary judgment as

2  to the question of whether probable cause existed under this statute.

3                                    **e.    Conclusion**

4        For the reasons stated above, the Court concludes that there are genuine issues of material

5  fact with regard to whether the SFPD Individual Defendants had probable cause to arrest Plaintiff

6  under any of the provisions discussed above.    Therefore, Defendants' request for summary

7  judgment on this ground is DENIED.

8                          **4.    Plaintiff's Parole**

9        Defendants assert that Plaintiff "cannot challenge any portion of his detention after the parole

10  hold was put in place," citing California Penal Code section 3067.  Under that provision, "[a]ny

11  inmate who is eligible for release on parole pursuant to this chapter shall agree in writing to be

12  subject to search or seizure by a parole officer or other peace officer at any time of the day or night,

13  with or without a search warrant and with or without cause."  Defendants further cite to case law

14  holding that "[u]nder California and federal law, probable cause is not required to arrest a parolee

15  for a violation of parole."  *U.S. v. Butcher*, 926 F.2d 811, 814 (9th Cir. 1991).  Plaintiff does not

16  contest that he was a parolee at the time of the relevant events, or that he was subject to the

17  requirements of section 3067.  He argues, however, that his status as a parolee cannot retroactively

18  give rise to probable cause for his arrest.

19        Plaintiff is correct that an officer must know of a detainee's parole status before that person

20  can be detained and searched pursuant to a parole condition.  *Moreno v. Baca*, 431 F.3d 633, 641

21  (9th Cir. 2009).  "Police officers cannot justify a suspicionless search and arrest on the basis of an

22  after-the-fact discovery of an arrest warrant or a parole condition."  *Id.*  Thus, to the extent a jury

23  could reasonably conclude that Plaintiff was arrested *before* the officers learned that Plaintiff was a

24  parolee, Defendants are not entitled to summary judgment on Plaintiff's false arrest claim on the

25  basis of the fact that Plaintiff was on parole.[5]

26        ───────────────────

27        [5]The Court notes, however, that Plaintiff has not specifically challenged Defendants' assertion
   that Plaintiff's false arrest claim became non-actionable once his parole officer instructed the Defendant
   officers to place a parole hold on him.  Nor has the Court found any authority suggesting that Plaintiff's
   false arrest claim would be viable after that point.  Rather, the Court concludes that Plaintiff is not

28  entitled to recover damages on his false arrest claim for any detention *after* the officers became aware

24

**C.      Excessive Force Claims Against Officers Trapsi and Franco**

Defendants argue that they are entitled to summary judgment on Plaintiff's excessive force claims as to Officers Franco and Trapsi because these officers were not involved in the alleged punching and kicking of Plaintiff. Defendants further assert that any force used prior to the alleged punching and kicking to remove Plaintiff from the car was reasonable as a matter of law.

"A claim against law enforcement officers for excessive force is analyzed under the Fourth Amendment's 'objective reasonableness' standard." *Arpin v. Santa Clara Valley Transportation Agency*, 261 F.3d 912, 921 (9th Cir. 2001). Determining whether the force used was reasonable "requires careful attention to the facts and circumstances of each particular case, including the severity of the crime at issue, whether the suspect poses an immediate threat to the safety of the officers or others, and whether he is actively resisting arrest or attempting to evade arrest by flight." *Graham v. Connor*, 490 U.S. 386, 396 (1989). "The reasonableness of a particular use of force must be judged from the perspective of a reasonable officer on the scene, rather than with the 20/20 vision of hindsight." *Id.* Moreover, "'[n]ot every push or shove, even if it may later seem unnecessary in the peace of a judge's chambers,' violates the Fourth Amendment." *Id.*

In evaluating the nature and quality of the intrusion, courts must consider "the type and amount of force inflicted." *Chew v. Gates*, 27 F.3d 1432, 1440 (9th Cir. 1994). Relevant factors to consider in determining whether the use of force is supported include "whether a warrant was used, whether the plaintiff resisted or was armed, whether more than one arrestee or officer was involved, whether the plaintiff was sober, whether other dangerous or exigent circumstances existed at the time of the arrest, and the nature of the arrest charges." *Id.* at 1440 n.5. In cases involving investigatory stops, drawing weapons and using handcuffs or other restraints is unreasonable in many situations. *See, e.g., Robinson v. Solano County*, 278 F.3d 1007, 1015 (9th Cir. 2002) (recognizing "as a general principle that pointing a gun to the head of an apparently unarmed suspect during an investigation can be a violation of the Fourth Amendment, especially where the individual poses no particular danger"); *Washington*, 98 F.3d at 1187("[u]nder ordinary circumstances, when

that Plaintiff was a parolee and had been instructed to place a hold on Plaintiff.

the police have only reasonable suspicion to make an investigatory stop, drawing weapons and using handcuffs and other restraints will violate the Fourth Amendment").

### 1.    Officer Franco

Defendants argue that summary judgment should be granted as to all excessive force claims against Officer Franco because the officers who allegedly punched or kicked Plaintiff were male. There is conflicting testimony regarding Officer Franco's participation in the alleged punching and kicking of Plaintiff. According to Officer Franco, she was the only female officer present during the encounter with Plaintiff. Jemahl testified that the officer who opened the driver's side door was the officer who punched Plaintiff, and his testimony indicates that the officer who punched Plaintiff was male. When asked about the officer who struck Plaintiff Jemahl responded "he was an officer," and "he hit him, he knocked him down." Motion, Ex. B at 57. He also testified that while he was on the sidewalk on the passenger side of the car talking to a male officer, a female officer was nearby him, and it was during this time that Jemahl saw the other officers kicking Plaintiff. On the other hand, Officer Franco's testimony is that she opened the driver's side door of the Cadillac and participated in removing Plaintiff from the car, taking him to the ground, and attempting to gain control of him in order to handcuff him. Plaintiff's own testimony is that one officer punched him as he was being pulled out of the car and he felt multiple kicks to the back of the head after he hit the ground. Plaintiff does not know which officers punched or kicked him and testified that he could not identify any of the officers in the encounter.

Viewing the facts in the light most favorable to Plaintiff, a reasonable jury could conclude that Officer Franco participated in the alleged punching and kicking of Plaintiff. Jemahl testified that he was inside the car while Plaintiff was pulled out and struck, and he did not see a female officer on the passenger side of the car until after Plaintiff was already on the ground. It is unclear how long Plaintiff had been on the ground when Jemahl saw the female officer. Officer Franco's own testimony is that she opened Plaintiff's door and took him to the ground, therefore a jury could conclude that Jemahl was mistaken when he described the officer who punched Plaintiff as male. Although Plaintiff cannot attribute specific blows to each officer, he has presented sufficient evidence to create a genuine issue of material fact as to whether Officer Franco used excessive force

against him by punching or kicking him. *See Fisher v. City of Pittsburg*, No. C 05-2774 CW (PR), 2008 WL 4369986, at *6 (N.D. Cal. Sept. 24, 2008) (defendant not entitled to summary judgment on excessive force claim where plaintiff could not attribute specific blows to each officer because he was struck from different angles and lost consciousness during the beating).

Even if the evidence is not sufficient to show that Officer Franco punched or kicked Plaintiff, as discussed below a reasonable jury could still find that the force she used to pull Plaintiff from the car before she moved to the passenger side of the car was excessive. The Court finds that Officer Franco is not entitled to summary judgment on the excessive force claim and therefore DENIES Defendants' request for summary judgment on this issue.

### 2. Officer Trapsi

Plaintiff has failed to produce any evidence to support his excessive force claim against Officer Trapsi. Both Jemahl's and Officer Trapsi's testimony is that Officer Trapsi was on the passenger side of the car talking to Jemahl while Plaintiff was being pulled out of the vehicle and during the alleged kicking and punching. Plaintiff has failed to raise a genuine issue of fact regarding Officer Trapsi's alleged use of force, therefore Officer Trapsi is entitled to summary judgment on the excessive force claim as a matter of law. The Court GRANTS summary judgment as to Plaintiff's claim of excessive force against Officer Trapsi.[6]

### 3. All Conduct Other Than the Alleged Punches and Kicks

Defendants also seek summary judgment as to any force used prior to the alleged punching or kicking to remove Plaintiff from the car on the basis that it was reasonable as a matter of law. According to Defendants, the officers approached Plaintiff's car based on their suspicion that Plaintiff was armed or posed a safety threat, Plaintiff failed to comply with their orders to raise his hands and exit the car, and Plaintiff resisted being physically removed from the vehicle. Plaintiffs contest this, alleging that the officers approached the Cadillac with no basis for reasonable suspicion

---

[6]Defendants' Motion specifically requests that the Court grant summary judgment on the excessive force claim asserted against Officer Trapsi. At the February 26 hearing, Defendants, for the first time, requested summary judgment on Plaintiff's false imprisonment claim against Officer Trapsi as well, citing evidence that he was on the passenger side of the car during the encounter between Plaintiff and the officers. Because Defendants did not request summary judgment on Plaintiff's false imprisonment claim against Officer Trapsi in their Motion, the Court denies summary judgment on that claim on the basis that the request was untimely.

that Plaintiff posed a safety threat, the officers' guns were drawn, Plaintiff complied with their orders to raise his hands, and the officers forcibly removed Plaintiff from the vehicle at gunpoint as Plaintiff as he was attempting to get out on his own. Taking Plaintiff's allegations as true, the only circumstance favoring the use of force was Plaintiff's presence in an area of expected criminal activity. A rational jury could find that Plaintiff posed no immediate threat to the officers, that Plaintiff complied with the officers' orders, and that Plaintiff was not resisting the officers. The Court finds that the question of whether the force used by the officers prior to the alleged punching or kicking of Plaintiff was reasonable raises issues of material fact that must be decided by a jury. Accordingly, summary judgment on the issue of excessive force prior to the alleged punching or kicking is DENIED.

### D. Equal Protection Claims

Plaintiff alleges that his right to equal protection of the laws under the Fourteenth Amendment was violated based on the fact that he and Jemahl are African-American males. In the Motion, Defendants contend that Plaintiff has provided no evidence of discrimination and therefore that summary judgment should be granted in their favor on Plaintiff's equal protection claim. The Court agrees with Defendants that Plaintiff's equal protection claim fails as a matter of law.

The Equal Protection Clause provides that no state shall "deny any person within its jurisdiction the equal protection of the law." U.S. Const. Amend. XIV, § 1. The Equal Protection Clause "is basically a direction that all persons similarly situated should be treated alike." *City of Cleburne v. Cleburne Living Center*, 473 U.S. 432, 439 (1985). Where disparate treatment of a group is shown, the level of scrutiny to which the state's action is subjected depends upon the type of group classification at issue. *Id.* at 439-43.

A long line of Supreme Court cases makes clear that the Equal Protection Clause requires proof of discriminatory intent or motive. *See, e.g., Washington v. Davis*, 426 U.S. 229 (1976); *Village of Arlington Heights v. Metropolitan Housing Development Corp.*, 429 U.S. 252 (1977). These cases establish that plaintiff must prove two elements before they may be entitled to relief under the Fourteenth Amendment: 1) discriminatory effect; and 2) discriminatory purpose. In order to avoid summary judgment, a plaintiff "must provide evidence sufficient to permit a reasonable trier

28

of fact to find by a preponderance of the evidence that the [treatment] was racially motivated." *Serrano v. Francis*, 345 F.3d 1071, 1082 (9th Cir. 2003) (quoting *Bingham v. City of Manhattan Beach*, 341 F.3d 939, 949 (9th Cir. 2003)). However, evidence that the plaintiff and the defendant are of a different race or ethnicity combined with a disagreement as to the reasonableness of the defendant's conduct toward the plaintiff is alone insufficient to show a violation of the Equal Protection Clause. *Bingham*, 341 F.2d 949.

Here, the only evidence Plaintiff cites to support an equal protection violation is his race, and Plaintiff's own testimony is that none of the officers made any derogatory racial remarks to Plaintiff. Motion, Ex. A, 111:8-11. Conclusory allegations that Plaintiff's constitutional rights were violated because of his race not supported by any factual evidence are not sufficient to defeat summary judgment. *Fisher v. City of Pittsburg*, No. C 05-2774, 2008 WL 4369986, at *9 (N.D. Cal. Sept. 24, 2008). Further, no authority suggests that because Plaintiff is the same race as the occupants of the Honda that was the initial subject of the traffic stop there was racial animus as to Plaintiff, particularly when Plaintiff does not assert that the stop of the Honda was racially motivated. Accordingly, these claims claim fails as a matter of law. Defendants' Motion is GRANTED as to Plaintiff's equal protection claims.

### F. Due Process Claims

Plaintiff alleges that Defendants violated his "right not to be deprived of life or liberty" and his right to be "free from pre-conviction punishment" under the Due Process Clause of the Fourteenth Amendment. Compl. ¶¶ 26a, 26c. Defendants argue that Plaintiff's due process claims fail as a matter of law because claims of false imprisonment and excessive force during arrest are properly analyzed under the Fourth Amendment. The Court agrees.

A claim under the Fourteenth Amendment implicates a substantive due process analysis, and the Supreme Court is "reluctant to expand the concept of substantive due process." *County of Sacramento v. Lewis*, 523 U.S. 833, 842 (1998) (quoting *Collins v. Harker Heights*, 503 U.S. 115, 125 (1992)). Thus, "[w]here a particular Amendment provides an explicit textual source of constitutional protection against a particular sort of governmental behavior, that Amendment, not the more generalized notion of substantive due process, must be the guide for analyzing these claims."

*Albright v. Oliver*, 510 U.S. 266, 273 (1994) (internal quotations omitted). Claims for unreasonable searches and seizures and excessive force are "most properly characterized as [claims] invoking the protections of the Fourth Amendment, which guarantees citizens the right 'to be secure in their persons against . . . unreasonable . . . seizures.'" *Graham v. Connor*, 490 U.S. 386, 394 (1989). Accordingly, such claims should be analyzed under the Fourth Amendment "reasonableness" standard. *Id.* at 395.

Pursuant to *Graham*, Plaintiff's claims for false imprisonment and excessive force must be analyzed under the Fourth Amendment. Defendants' Motion for summary judgment as Plaintiff's Due Process claims is therefore GRANTED.

### G.  Qualified Immunity

Defendants assert that even if they are not entitled to summary judgment on Plaintiff's Fourth Amendment claims, they are entitled to qualified immunity on the claims of false imprisonment and excessive force because the conduct of the officers did not violate clearly established law. To the extent that Plaintiff asserts that the officers mistakenly interpreted Plaintiff's actions as threatening or criminal, Defendants argue that the officers are entitled to qualified immunity because such a mistake of fact was objectively reasonable under the circumstances. The Court disagrees.

#### 1.  Standard Governing Qualified Immunity

Under the doctrine of qualified immunity, even if a constitutional violation occurred, governmental officials are immune if their conduct "does not violate clearly established statutory or constitutional rights of which a reasonable person would have known." *Harlow v. Fitzgerald*, 457 U.S. 800, 818 (1982). To determine whether a defendant is entitled to qualified immunity, courts must first ask, "[t]aken in the light most favorable to the party asserting the injury, do the facts alleged show the officer's conduct violated a constitutional right?" *Saucier v. Katz*, 533 U.S. 194, 200 (2001). If not, the qualified immunity analysis ends here. *Id.* at 201. On the other hand, "if a

United States District Court

For the Northern District of California

violation could be made out on a favorable view of the parties' submissions, the next sequential step is to ask whether the right was clearly established." *Id.*[5]

The inquiry as to this second question must be "particularized." *Id.* It is not enough that the general rule is established. *Id.* Rather, "[t]he relevant dispositive inquiry in determining whether a right is clearly established is whether it would be clear to a reasonable officer that his conduct was unlawful *in the situation he confronted.*" *Id.* at 202 (emphasis added). The Supreme Court has cautioned that courts should afford "deference to the judgment of reasonable officers on the scene" and should not use "20/20 hindsight vision." *Id.* at 205. Thus, "[e]ven law enforcement officials who 'reasonably but mistakenly conclude that probable cause is present are entitled to immunity.'" *Hunter v. Bryant*, 502 U.S. 224, 227 (1991) (citing *Mitchell v. Forsyth*, 472 U.S. 511 (1985)).

Where a plaintiff asserts a Fourth Amendment violation based on the absence of probable cause, the relevant inquiry with respect to the "clearly established" prong of the qualified immunity analysis is "whether a 'reasonable officer could have believed that probable cause existed to arrest the plaintiff.'" *Sorgen v. City and County of San Francisco*, 2006 WL 2583683 (N.D. Cal. Sept. 7, 2006) (quoting *Franklin v. Fox*, 312 F.3d 423, 438 (9th Cir. 2002)).

### 2. Application of Standard to Facts

As discussed above, the Court finds that Plaintiff's facts, if proven true, would establish constitutional violations under the Fourth Amendment on the basis of Plaintiff's false imprisonment and the officers' use of excessive force. The next question for the Court is whether the rights violated were clearly established at the time Defendants acted. *Saucier*, 533 U.S. at 201. In determining whether the rights were clearly established, the Court must analyze whether Defendants could have reasonably believed their conduct did not violate a clearly established law. *Id.* at 202.

With respect to Plaintiff's false imprisonment claim, the Fourth Amendment right to be free from seizure without reasonable suspicion and arrest without probable cause is clearly established. *See Sokolow*, 490 U.S. at 7. Plaintiff's car was legally parked and, viewing the evidence in the light

---

[5] In *Pearson v. Callahan*, the Supreme Court clarified that the order of the two-step inquiry is not mandatory. Rather, courts should "exercise their sound discretion in deciding which of the two prongs of the qualified immunity analysis should be addressed first in light of the circumstances in the particular case at hand." --- U.S. ---, 129 S. Ct. 808, 818 (2009).

1   most favorable to Plaintiff, Plaintiff did not make any furtive movements or engage in evasive

2   behavior that would create a reasonable suspicion to justify seizing Plaintiff. In such circumstances,

3   a reasonable officer could not have concluded that reasonable suspicion existed to conduct an

4   investigatory stop of Plaintiff. Further, when Plaintiff was arrested depends upon facts that must be

5   determined by a jury. The final step of qualified immunity analysis must therefore wait the

6   determination of issues of fact. Accordingly, Defendants' motion for summary judgment on

7   qualified immunity from the false imprisonment claims is DENIED.

8        With respect to Plaintiff's excessive force claim, the right to be free from excessive force and

9   the general principle that "force is only justified when there is a need for force" are clearly

10  established. *See Blankenhorn v. City of Orange*, 485 F.3d 463, 481 (9th Cir. 2007) ("In assessing

11  the state of the law at the time of [plaintiff's] arrest, we need look no further than *Graham*'s holding

12  that force is only justified when there is a need for force."). It is also recognized that "pointing a gun

13  to the head of an apparently unarmed suspect during an investigation can be a violation of the Fourth

14  Amendment, especially where the individual poses no particular danger." *Robinson*, 278 F.3d at

15  1015. Assuming, as Plaintiff contends, that the officers ordered him from the vehicle at gunpoint

16  with no reason to suspect he posed a threat, forcefully pulled him from the car, and punched and

17  kicked him as he was being pulled from the car and while he was on the ground, these clearly

18  established principles would have given a reasonable officer fair notice that his use of force might

19  have been excessive under the circumstances. Accordingly, summary judgment in favor of the

20  officers on the issue of qualified immunity from the excessive force claim is also DENIED.

21  **IV.    CONCLUSION**

22       For the reasons stated above, Defendants' Motion is GRANTED in part and DENIED in part.

23  The Court dismisses with prejudice the following claims: 1) Claim One as to Officer Trapsi to the

24

25

26

27

28

extent it is based on excessive force; 2) Claim Two as to all Defendants. Plaintiff has stipulated to the dismissal of his *Monell* claim against the City and County of San Francisco as well as Claims Three through Thirteen, therefore the Court also dismisses these claims with prejudice.

IT IS SO ORDERED.

Dated: March 11, 2010

_____
JOSEPH C. SPERO
United States Magistrate Judge